687 A.2d 354

EMILIO MARTIN CARO, PETITIONER,
v. SUSAN SHER, RESPONDENT.

Superior Court of New Jersey
Chancery Division
Family Part
Monmouth County

October 30, 1996.

---

*Alberto Ulloa,* for petitioner.

*Candido Rodriguez,* for petitioner.

*Patricia E. Apy,* for respondent (Paras, Apy & Reiss, attorneys).

HAYSER, J.T.C., temporarily assigned.

Petitioner brings this action seeking the return of children to the place where they habitually resided, pursuant to the Convention on the Civil Aspects of International Child Abduction, adopted at the Hague on October 25, 1980 (the Convention). The threshold issue is whether this court should abstain from exercising any jurisdiction in this matter, beyond ordering the return of the children, in the absence of clear and convincing evidence that the custodial issues involved cannot be evaluated and resolved fairly by the courts where the children have habitually resided.

## I. *Factual History*

Significant facts in this matter are not in dispute. The parties were married in 1983 in Spain, where they lived. Petitioner is a Spanish national, and respondent an American citizen who has lived in Spain substantially since 1975. Three children were born of the marriage, who are presently thirteen, eleven and seven years of age.

In September, 1992 respondent filed with the Spanish Tribunal of First Instance in Alicante, Spain for separation and custody of the children. In February, 1993 a provisional decree was entered, granting the respondent a legal separation, as well as primary and residential or physical custody of the children. She was also granted use of the marital home, monthly marital support and payment of certain legal expenses. Respondent was also granted half of the children's Christmas, Easter and summer vacations,

which she was free to take in the United States, after consultation with the petitioner, or court intervention thereafter, if necessary.

Presumably, in reliance, in part at least, on the vacation relief granted respondent by the Spanish court, she traveled with her children for vacation in the United States in July, 1993, whereupon she immediately filed in this court for divorce and custody. Petitioner, thereupon, filed his first petition for the children's return to Spain, pursuant to the Convention.

Following a hearing on August 20, 1993, the trial judge ordered the children's return to Spain, holding that it was the country of the children's "habitual residence" and that they were "wrongfully retained" from "their country of habitual residence." (*Trial Court Opinion*, decided August 20, 1993, pp. 4 and 5).[1] There was no successful appeal of this decision, and respondent's complaint for divorce and custody was thereafter dismissed with prejudice by stipulation. The children were returned to Spain.

In October, 1993 the provisional separation decree, which is presently under appeal by the respondent, was finalized. In September, 1994 respondent filed with the Spanish court to finally leave Spain with the children and reside with them in the United States. This petition was denied on November 16, 1994, and a subsequent appeal to the Audiencea Provincial (Court of Appeals) of Alicante will not be heard until September 15, 1998, pursuant to that court's order of February 1, 1995. This decision was appealed on May 16, 1995, to the Constitutional Court of Madrid and is pending, also, at this time.

Between 1993 and the present, respondent has filed at least twelve petitions to enforce support payments by the petitioner, all of which were granted by the Alicante court, with many decided in a period of approximately thirty days. Respondent has been

---

[1] The earlier trial court also decided that "the merits of a custody and visitation dispute" were to be resolved by the appropriate Spanish court. *Id.* at 10.

represented by legal counsel throughout her various proceedings before the Spanish courts.

On June 28, 1996, respondent's counsel filed a petition with the Alicante trial court, giving notice that with petitioner's consent, she would again vacation with the children in the United States from July 8, 1996 to August 17, 1996, returning in time for the children to start school on September 9, 1996.[2] After leaving Spain, respondent's counsel filed a second petition with the Alicante court to finally leave Spain with the children and reside in the United States. This petition is also pending at this time.

Upon arriving in the United States, respondent advised petitioner that she would not be returning with the children to Spain. The present petition was filed under the Convention on September 9, 1996 before this court. A hearing was conducted on October 9, 1996, at which time testimony was given by the respondent and her Spanish counsel, exhibits were admitted into evidence and arguments were presented as to the threshold issue. Supplemental memoranda were submitted by the parties, also, as to this issue.

## II. *Objectives of the Convention*

The Convention was adopted at the Hague on October 25, 1980. This treaty became effective on July 1, 1988 in the United States, following the adoption of the implementing statute, the International Child Abduction Remedies Act (ICARA), 42 *U.S.C.A.* §§ 11601 to 11610 (1988).

One finding of the ICARA is that "[p]ersons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention." 42 *U.S.C.A.* § 11601(a)(2). Congress de-

---

[2] Despite the fact that the earlier trial court determined in 1993 that the children were wrongfully removed and had to be returned to Spain, the Spanish court did not thereafter modify or rescind the respondent's right to vacation with the children in the United States. In fact, it was during a 1995 summer vacation in the United States that the youngest child was diagnosed with an attention deficit disorder and hyperactivity.

clared that there is "the need for uniform international interpretation of the Convention," and that "courts in the United States [are empowered] to determine only rights under the Convention and not the merits of any underlying child custody claims." §§ 11601(b)(3)(B) and (b)(4). Moreover, the purposes of the Convention include "ensur[ing] that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." (The Convention, art. 1(b)).

State courts have concurrent original jurisdiction with federal courts to enforce the Convention's remedies. 42 *U.S.C.A.* § 11603(a). However, four requirements must be met to invoke the Convention's relief:

1. The nations involved must be signatories to the Convention. *Roszkowski v. Roszkowska*, 274 *N.J.Super.* 620, 633, 644 *A.2d* 1150 (Ch.Div.1993);

2. The children must be "habitual resident[s] in a Contracting State immediately before any breach of custody or access right." (The Convention, art. 4);

3. The children must be under the age of sixteen. (The Convention, art. 4); and

4. The children's removal or retention in a country other than their place of habitual residence must have been wrongful, *e.g.* "it is in breach of rights of custody attributed to a person ..., either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention." (The Convention, art. 3(a)).

III. *Application of the Convention to Pending Matter*

Spain was an original signatory with the United States to the Convention. The earlier trial court determined that the children's "habitual residence" was in Spain, and that unappealable conclusion is not disputed in the present proceedings, despite their vacation visits to the United States. Collateral estoppel, if not the "law of the case" must be applied to this issue. *Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 *F.*3d 1227 (3d Cir.1995); *State v. Reldan*, 100 *N.J.* 187, 203, 495 *A.*2d 76 (1985). *See also Roszkowski*, 274 *N.J.Super.* at 633, 644 *A.*2d 1150. The children are, now, as they were in 1993, under the age of sixteen.

Finally, the earlier trial court determined that "[p]etitioner was exercising his rights of custody pursuant to the February 22, 1993 Decree" and the Convention's Article 5(a), when the children were

wrongfully removed from Spain. (*Trial Court Opinion, supra*, at pp. 4 and 5). In this regard, respondent's Spanish counsel testified at the hearing that both parents under Spanish law held joint custody of the children to determine major decisions as to their development under the concept of "patria potestas," with the children's required residence in Spain. This is more than "access" being the only right retained by the petitioner "under the law of the State in which the [children were] habitually resident." *See* the Convention, art. 3(a) and 5.[3]

### A. *Article 13(b)—Grave Risk of Harm*

The Respondent correctly argues that Article 13(b) of the Convention provides an exception to the return of a child to the

---

[3] Contrast the present situation with that in *Ivaldi v. Ivaldi*, 288 *N.J.Super.* 575, 672 *A.2d* 1226 (App.Div.1996), wherein under the separation agreement, the respondent (defendant) not only had physical custody of the child, but also had the right to take up residence in her own country of Morocco with the child, while clearly acknowledging in the agreement only the petitioner's visitation rights in the United States. Respondent, herein, also argues that the petitioner has abandoned any "custody" or "access" rights, as of January, 1996, if not earlier, limiting himself to "brief contacts" thereafter. *See Respondent's Certification*, dated September 24, 1996, paragraphs 14 and 15. However, the certification also reflects the children's difficulties in parental reconciling with their father. Needless to say, the petitioner's certification presents a different picture as to his interest in his children, beyond the two petitions he has timely filed in this court for their return to Spain. Furthermore, as the respondent's Spanish counsel testified, the initial issues of custody and support will be further addressed, enlarged, rescinded and/or modified with party testimony at an appeal hearing before the Audiencia Provincial in January, 1997. At this point, the issue is clouded not only by the competing certifications, but the pending court proceedings in Spain. Nevertheless, if this was the sole issue present in this controversy, further inquiry might be warranted. *See* the Convention, art. 13(a) ("[T]he requested State is not bound to order the return of the child if the person ... which opposes its return establishes that ... the person ... having the care of the ... child was not actually exercising custody rights at the time of the removal or retention."). Moreover, contrast the petitioner's actions in the present matter with those of the defendant in *Schroeder v. Vigil–Escalera Perez*, 76 *Ohio Misc.2d* 25, 664 *N.E.2d* 627, 631 (Ohio Com.Pl.1995). Finally, Article 21 of the Convention provides that even the "right of access" may be effectively protected "in the same way as an application for the return of a child" for custody violations.

place of habitual residence where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." She now argues as to the risk of "physical or psychological harm" if the children are returned to Spain, having unsuccessfully argued to the trial court in 1993 that their return would be an "intolerable situation."

Specifically, the respondent contends that the children may be endangered by the petitioner's conduct and lack of support and the youngest child's need for therapy and medication claimed not available in Spain. Her Spanish counsel testified that unlike the petition for return filed in September, 1994, whose focus was the respondent's unhappiness in continuing to live in Spain and her and the children's claimed desire to make a lifestyle change, the petition for return filed in July, 1996 is directed to the above issues. As indicated, that latter petition is also pending at this time before the Spanish court.

### B. *Article 20—Due Process*

Finally, the respondent argues that under Article 20 of the Convention, return may also be refused "if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Specifically, the respondent contends that while the Alicante courts may not bear her any ill will, the delay by the Court of Appeals in hearing her petition for return filed September, 1994 until September, 1998 violates our fundamental interest in procedural due process.

New Jersey has a long tradition of exercising *parens patriae* jurisdiction to protect the safety and welfare of children having substantial contacts with this State. *Lippincott v. Lippincott*, 97 *N.J.Eq.* 517, 519–21, 128 *A.* 254 (E. & A. 1925). However, custody disputes involving children residing in another country stand on a different plane. *Schmidt v. Schmidt*, 227 *N.J.Super.* 528, 533, 548 *A.*2d 195 (App.Div.1988).

In this regard, the Convention is concerned with international custody disputes. There, indeed, are exceptions that would require this court, or any American court, not to abstain in the best interests of the child. However, the court must also be satisfied that the foreign court would not protect and fairly resolve issues concerned with the child's best interests. While there must be more than a "cursory evaluation" as to whether the foreign court can decide the custody dispute, *see Tahan v. Duquette*, 259 *N.J.Super.* 328, 334, 613 *A.*2d 486 (App.Div.1992), the burden is on the respondent to prove by "clear and convincing evidence" that Article 20 of the Convention may be invoked. 42 *U.S.C.A.* § 11603(e)(2)(A).

In *Ivaldi v. Ivaldi*, 288 *N.J.Super.* at 589, 672 *A.*2d 1226, concerning the return to the United States of a child living in Morocco, a non-signatory to the Convention, the Appellate Division still concluded:

> Even were we to find that the Family Part had subject matter jurisdiction, the result would not be different. In our view, the court would have been obliged to abstain and defer to the jurisdiction of the Moroccan court under recognized principles of international comity.... It is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard to the rights of its own citizens or of other persons falling within its protection. (Citations omitted).

> . . . .

> Nothing has been presented to the Family Part or this court indicating that the question of custody cannot be fairly resolved by the courts of Morocco. The record is devoid of evidence suggesting in any way that the best interests of the child will not be protected. Under these circumstances, we believe that the Family Part should have abstained even assuming that it had subject matter jurisdiction.

In *Tahan*, the appellate court agreed with the trial court that even an "Article 13 inquiry" under the Convention was not designed to deal with custody issues and their factual developments reserved to plenary proceedings before the foreign tribunal that has original subject matter jurisdiction, barring a finding after careful scrutiny of the proofs presented, that a fair and proper resolution of the dispute cannot be provided by that foreign tribunal. *Id.* at 334, 613 *A.*2d 486.

Therefore, under the facts of this case, the court must initially determine whether the claims raised by the respondent under Article 13(b) of the Convention may be fairly addressed by the Spanish courts. As stated by the court in *Loos v. Manuel*, 278 *N.J.Super.* 607, 612, 651 *A.*2d 1077 (Ch.Div.1994), "in proceedings under the Convention, the court's role is not to make traditional child custody decisions. It is to determine in what jurisdiction the child should be physically located, so that the proper jurisdiction can make custody decisions." [4]

As discussed, the respondent has the burden of proving by "clear and convincing" evidence that the return would violate the "fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms" under Article 20 of the Convention. In that regard, she argues only that the denial of a return hearing as to her 1994 petition until 1998 violates our fundamental principle of procedural due process.

■ Obviously, the concept of "clear and convincing" is more stringent than the ordinary civil standard of "preponderance of the evidence," and is reserved for the protection of important interests. *Santosky v. Kramer*, 455 *U.S.* 745, 766, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982). In the context of an Article 20 defense, it places a heavy burden on the respondent. History of an enactment, or even a treaty, can be an aid in understanding the import of a particular provision. *Helfrich v. Hamilton Tp.*, 182 *N.J.Super.* 365, 370, 440 *A.*2d 1366 (App.Div.1981).

■ The Explanatory Report as to the adoption of the Convention, prepared by Elisa Perez–Vera, states as to Article 20, at page 462, that:

---

[4] In *Friedrich v. Friedrich*, 78 *F.*3d 1060, 1067 (6th Cir.1996), the court stated: "All four of [the] exceptions [under the Convention] are 'narrow,' 42 *U.S.C.A.* § 11601(a)(4). They are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute. [Citation omitted] ... In fact, a ... court retains, and should use when appropriate the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention. [Citation omitted]."

> [T]o be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles.... A study of the case law of different countries shows that the application by ordinary judges of the laws on human rights and fundamental freedoms is undertaken with a care which one must expect to see maintained in the international situations which the Convention has in view.
>
> [*Id.* at 462, Hague International Child Abduction Convention; 51 *Fed.Reg.* 10510–11 (1986) ("[T]his exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed.") ]

Respondent's Spanish counsel testified, generally, as to the manner in which custody issues are resolved before the Spanish courts, including those of Alicante. Apparently, for example, individual complaints or petitions are filed stating separate causes of action, without benefit of any liberal amendment rule such as *R.*4:9. However, it appears that there is no corresponding rule for the application of the entire controversy doctrine, such as *R.*4:30A.

Rulings, at least initially, are made on the basis of party statements, submitted documents and attorney argument. Apparently, also, appellate courts do not usually "exercise such original jurisdiction as is necessary to the complete determination of any matter on review." *R.*2:10–5.

Counsel also testified that there exist procedures for emergent applications to the Spanish courts as to issues of child abuse and medical emergencies. In custody issues, psychological reviews are routinely required, usually through a court list of reviewers that may be supplemented by a party's own submitted, voluntary reviews. He also testified that the Spanish courts, under a common law rule now supplemented by a statute, require consultation with mature children as to their desires for custody and where they wish to live.

His most relevant testimony, however, concerned the existence of and reasons for disposition delays, not common generally, apparently, in Spanish courts, but common for those of Alicante. This problem affects many litigants, not only the respondent. It

involves an ongoing dispute, if not political struggle, between those charged with administering a claimed overburdened provincial court system and those who control the budgetary purse strings. It is a problem faced by many parties, and not unique only to Spain—*e.g., Flowers v. Warden, Connecticut Correctional Institution,* 853 *F.*2d 131 (2d Cir.1988) (Seventeen-month delay in bringing state murder defendant to trial during which time he was incarcerated, did not violate his Sixth Amendment right to speedy trial where reason for delay was docket congestion and a rigid chronological approach to case management).

It is also true that counsel testified that the Alicante court responded quickly to numerous support enforcement requests of the respondent. However, the issue goes beyond a cursory consideration of whether or not an American court believes it can more quickly resolve the dispute. *Friedrich v. Friedrich,* 78 *F.*3d at 1067.

Therefore, it is important to know what has been the reaction of the Spanish appellate tribunals to the "Alicante crises" or similar problems. In this regard, respondent has provided the court with several Madrid newspaper articles bearing on this subject. There was no objection by the petitioner as to the submission of these articles to the court.

In one article, it was reported that the Constitutional Court in Madrid overturned an Alicante court's decision in February, 1994, which set an appeal hearing date for March, 1996 in what is termed "a minor suit." The Court held that the right to a trial without undue delays had been violated, and that such factors as work overload "do not exonerate the State from fulfilling its obligation to immediately provide its Department of Justice with the human and material resources it requires in order to give it the ... effectiveness demanded by the Constitution." It is before this same Constitutional Court that the respondent has her appeal pending as to the September, 1998 hearing established by the Alicante court for consideration of her return application filed in September, 1994.

In a second newspaper article, it was reported that the National Court of Spain ordered the Government to pay a litigant damages resulting from unreasonable delays by the Court of Barcelona, which resulted in a thirty-two month period during which the petitioner did not receive alimony payments after filing for separation. This was considered a violation of the litigant's right to a speedy trial, whether civil or criminal, under Article 24 of the Spanish Constitution.[5]

These articles were presumably submitted by the respondent to demonstrate the problems in the Spanish court system, but more convincingly show the existence of realistic and progressive remedies in overcoming the lethargy of a judicial bureaucracy.

It is important, also, to focus on the nature, as well as status, of the September, 1994 return petition, and contrast it with the July, 1996 petition, both pending before the Spanish courts at this time.

Respondent's Spanish counsel testified that the focus of the 1994 petition is the respondent's desire to leave the unhappiness she has experienced in Spain, including the need for frequent support enforcement proceedings, and her and her children's desire to assume a claimed more stable lifestyle in the United States. It is questionable if the need to petition a court for support enforcement, whether granted or denied, is a sufficient basis to approve a removal petition no more than the fact that one was an unsuccessful litigant would be the factor to determine the objective fairness of the judicial system. In contrast, the 1996 petition is focused upon the psychological health of the children, claimed affected by the continued strife, and the particular medical needs of the youngest child, allegedly requiring treatment abroad.

Furthermore, the appeal hearing in January, 1997, will address the substance of the separation decree, including the issues of support and custody. It will be, under the Spanish procedures,

[5] One can only wonder as to the reaction of budgetary leaders in this or any other American jurisdiction if such a novel remedy for the effect of backlogs resulting from claimed budgetary constraints was adopted.

the first opportunity that apparently will be given the respondent to testify and express her concerns as to these and other related issues.

It is clear that the Spanish courts' civil procedures do not correspond in all respects with those in this jurisdiction. However, the signatories to the Convention, while recognizing that "the interests of children are of paramount importance in matters relating to their custody" did not necessarily agree to adopt the jurisprudence precepts of one signatory and thereby limit their own sovereignty. *See* Preamble to the Convention and art. 1(b). Article (1)(b), to the contrary, makes it clear that an objective of the Convention is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *See also* 42 *U.S.C.A.* § 11601(b)(3).

The specific custody concerns that the respondent has raised can and should be addressed in a plenary hearing. However, we cannot simply assume that these concerns, both under Article 13(b) of the Convention, and even Article 13(a), cannot be resolved adequately by the courts in the place of habitual residence.[6]

Has the respondent demonstrated by "clear and convincing" evidence that the delay in acting upon the 1994 removal petition reaches beyond being "manifestly incompatible", (Explanatory Report of the Convention, at p. 462), with our concept and

---

[6] As stated by the *Friedrich* court:

> The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence.

> . . . . . . .

> [W]e acknowledge that courts in the abducted from country are as ready and able as we are to protect children. *If return to a country. or to the custody of a parent in that country is dangerous, we can expect that country's courts to respond accordingly....* And if Germany really is a poor place to grow up, as [respondent] contends, we can expect the German courts to recognize that and award her custody in America.
> [*Id.* at 1068 (emphasis added).]

principle of procedural due process, requiring the invocation of Article 20 of the Convention? A careful review of the testimony, exhibits and record presented to the court requires this question to be answered in the negative.

The 1994 removal petition is only one aspect of the respondent's present proceedings before the Spanish courts in the total interests of the children. It is clear from the record that since, at least, 1993, she has had a single-minded determination to return to the United States with her children. This is understandable in human terms in that she believes they will live better and happier here.

However, as to this specific petition, while there has been a delay in the lower Spanish court as to resolution, respondent is presently before the Constitutional Court, which the record shows is not unwilling to address such a problem and grant appropriate relief where necessary. In determining the issue of procedural due process, it is appropriate to consider the effective availability of appellate review as a remedy for trial delays. Furthermore, the 1996 return petition pending is more directed to respondent's present concerns for the children.

Moreover, the issues of custody and support, including the psychological impact on the children, as well as the medical needs of the youngest child, are presently before the Spanish courts. Finally, the Alicante court has, at least, not been reticent to enforce support obligations on behalf of the respondent and children.

In the final analysis, there is nothing that leads this court to conclude that the Spanish courts would not address the respondent's present, specific custody concerns in the best interests of the children. If these concerns could not be addressed by the foreign courts, this court would still have to consider whether the exceptions under Article 13(a) and (b) of the Convention should be applied, and have required proofs presented by the respondent.

To conclude that even in the presence of a claimed "grave risk of harm," no consideration must be given as to whether the foreign courts can adequately address that issue under some minimum concept, for example, of procedural due process, would make a mockery of the Convention. Every nation would carve out a broad exception under an individual concept of *parens patriae* and the treaty would be meaningless. To avoid such an inappropriate result, consideration of an Article 20 defense under the facts of such a case as the present must be a threshold issue for resolution, before any other possible exceptions are analyzed under the Convention.

Finally, respondent has requested that the court interview, at least, the older children to determine their wishes as to the return to Spain. Article 13 of the Convention also provides that "[t]he judicial ... authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."

It is noted that the above provision is discretionary. Such interviews will have no impact on the threshold issue as to whether the Spanish courts can fairly address respondent's present custody concerns under Article 20 of the Convention.

Furthermore, as testified by respondent's Spanish counsel, the Spanish courts must consider the wishes of the children in finally resolving custody, as well as return, issues. Finally, the certification of the respondent makes clear, if accepted, the emotional trauma the children, ages seven through thirteen, have experienced in this continuous struggle between the parties over the last three years. The court will not add to their discomfort as argued by the petitioner, and test to what degree their present views simply reflect the emotional upheaval and their desire, finally, for normalcy and permanency, here if not in Spain.

The petition is granted to the extent that the children shall be returned forthwith to Spain, the place of their habitual residence from which they were wrongfully removed under Article 3 of the

Convention for proper determination of the custody issues raised by the respondent and pending before the Spanish courts.

Pursuant to 42 *U.S.C.A.* § 11607(b)(3), reasonable counsel fees and costs will be awarded the petitioner, subject to the right of the respondent to demonstrate that such an award of fees and costs would be clearly inappropriate. Cross certifications and/or briefs as to this issue shall be submitted within ten days, together with a proposed Order to be prepared by petitioner's counsel.